53 CCPA

**Gordon GOULD, Appellant,**

v.

**Arthur L. SCHAWLOW and Charles H. Townes, Appellees.**

**Patent Appeal No. 7511.**

United States Court of Customs
and Patent Appeals.

Aug. 4, 1966.

Darby & Darby, New York City, (Robert R. Keegan, Harvey W. Morti-mer, New York City, of counsel), for appellant.

Arthur J. Torsiglieri, Chatham, N. J., Edwin B. Cave, New York City, for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

WORLEY, Chief Judge.

Gould [1] appeals from the decision of the Board of Patent Interferences which awarded priority of invention of the subject matter set forth in four counts to the senior party, Schawlow and Townes (Schawlow). [2] After reviewing a voluminous record in light of appellant's allegations of reversible error, but finding none, we affirm that decision.

The invention relates to an apparatus for *light amplification* by *stimulated emission* of *radiation*, better known by the acronym "laser."

It appears that amplification of electromagnetic radiation by stimulated emission of radiation was first realized on a practical basis by devices [3] operating in the microwave frequency range. The laser is described in the record as an extension of the maser principle to optical wavelengths, i. e. infrared, visible and ultraviolet light. No matter in what portion of the electromagnetic spectrum it is designed to operate, it appears that the heart of a maser-like device is a

1. Gould is involved on application Serial No. 804,539, filed April 6, 1959, assigned in 1960 to TRG, Inc., a subsidiary of Control Data Corporation. In November 1957, the time Gould alleges conception of the invention in issue, he was a graduate student in physics at Columbia University and also worked as a research associate in the Columbia Radiation Laboratory. While the subject matter of his thesis bore no relation to lasers or masers, his work at Columbia Radiation Laboratory related to optically pumped microwave masers.

2. Schawlow and Townes are involved on Patent No. 2,929,922, issued March 22, 1960, on an application filed July 30, 1958, and assigned to Bell Telephone Laboratories, Inc. The counts correspond to claims 4, 5, 8 and 9 of that patent.

At the time of interest here, Dr. Townes was a professor of physics at Columbia University and also served as a consultant to Bell Telephone Laboratories. Dr. Schawlow was employed as a research physicist at Bell Telephone Laboratories.

3. It seems that the invention of such devices for microwave *amplification* by *stimulated emission* of *radiation*, known as "masers," is generally attributed to the same Dr. Townes who is a party to this interference. For his contributions to the maser field, he shared the 1964 Nobel Prize in physics.

working medium, generally a gas or solid, containing atoms or molecules which have one or more sets of energy levels. Unlike the situation ordinarily prevailing in a volume of matter at equilibrium, where the lower energy states of the material will be more heavily populated with atoms or molecules than the higher energy levels, the laser working medium contains material in which a higher energy level is populated by a significantly greater number of atoms than is a lower energy level of the material. A working medium in such a non-equilibrium condition is said to have an "inverted population" or "negative temperature." The means used to excite or "pump" the working medium to create an inverted population of atoms or molecules may comprise a source of electromagnetic energy, for example, a strong light of suitable wavelength directed at the working medium.

The record also shows that a medium in which a population inversion exists may be stimulated to emit its stored energy by wave energy (microwave energy in a "maser" and light energy in a "laser") of the frequency corresponding to the energy separation of the inverted pair of energy levels, thus amplifying the stimulating signal. In marked contrast to white light from the sun or an electric light bulb, which consists of a whole spectrum of colors and which is emitted in a random, non-directional manner when excited atoms spontaneously return to a lower energy level, the light radiation emerging from the laser device here under conditions of stimulated emission is both "temporally coherent" (a term used to describe the monochromatic nature of the emitted light) and "spatially coherent" (a term used to describe the tendency of the emergent light to undergo little divergence or spreading).

The counts of the interference relate to a laser comprising an active medium with the requisite energy level characteristics, means for pumping that medium, and a cavity resonator to enhance the laser operation. The cavity employed in microwave masers which characteristically has dimensions of the order of one wavelength, e. g. 1–100 centimeters, cannot be conveniently employed in light amplifiers because of the shortness $(10^{-5}$—$10^{-2}$ cm) of light wavelengths. Rather, a cavity is utilized which has dimensions on the order of thousands or more of light wavelengths. Typically, the cavity defined by the counts is formed by a pair of spaced, plane, parallel optical reflectors, at least one of which is partially transparent, and side members through which pumping energy is admitted and some of the spontaneous and undesired stimulated emission, deviating in its travel from an axis perpendicular to the reflecting end plates, is allowed to escape. The laser employing a pair of opposed reflectors is now termed a Fabry-Perot laser, since the structure involved is reminiscent of the so-called Fabry-Perot interferometer used by physicists for a number of years. The desired output beam of the laser is built up or amplified by repeated passes back and forth along the axis perpendicular to the reflecting end plates, ultimately passing out of the cavity through the partially transparent end reflecting member in coherent form.

With the advent of devices capable of amplifying radiation other than microwaves, the term "maser" has assumed a more general meaning—*m*olecular *a*mplification by *s*timulated *e*mission of *r*adiation. The Schawlow patent uses the expression "optical maser" to denote an apparatus performing the function of the "laser." As a consequence, the counts employ the expression "maser." Count 1, to which we have added numerals keyed to Fig. 2 of the Schawlow patent reproduced below, is representative:

1. A maser generator comprising a chamber [14] having end reflective parallel members [16, 17] and side members [15], a negative temperature medium disposed within said chamber, and means [20] arranged about said chamber for pumping said medium,

said side members being transparent to the pumping energy and transparent to or absorptive of other energy radiated thereat.

FIG. 2

Some controversy has arisen in the parties' briefs and at oral argument as to the various forms of laser devices within the scope of the counts. We find it unnecessary to treat that issue for reasons which will become evident later in this opinion, and will proceed on the assumption that the counts are as broad as Gould asserts.

Both Schawlow and Gould rely on their filing dates of July 30, 1958, and April 6, 1959, respectively, for constructive reduction to practice of the subject matter in interference, neither party alleging an actual reduction to practice prior to those dates. Under such circumstances it is, of course, well established interference law that the junior party, here Gould, must prove by a preponderance of the evidence (1) conception of the invention prior to July 30, 1958,[4] and (2) reasonable diligence in reducing it to practice commencing from a time just prior to July 30, 1958, to his filing date of April 6, 1959. 35 U.S.C. § 102(g). The board found that Gould had failed to prove either conception or diligence. We shall consider those issues separately.

*Conception*

In attempting to discharge his burden of proof, Gould relies primarily on his own testimony coupled with Exhibit 1, which is a bound notebook identified as notebook #1. Pages 1 to 9, the only pages relevant here, were witnessed November 13, 1957, by a notary public. The notary testified that, while he did not read the contents of that notebook and would not have understood them had he tried to do so, "those pages were full" at the time he signed on the margins. The board, but for two "insignificant exceptions" relating to additions Gould admitted making after the date of notarization, accepted Exhibit 1 as a "genuine and authentic document existing substantially as when notarized."

However, the board held that pages 1 to 9 of Exhibit 1 did not disclose "an operative embodiment of the subject matter of the counts," stating:

\* \* \* In particular, the notebook No. 1 does not specifically indicate how the pump light is to be applied to the active medium nor that the sides of the cavity are transparent to the laser light. Gould himself testified that

---

4. Schawlow and Townes submitted testimony and documentary exhibits to establish their conception earlier than their filing date. The board did not find it necessary to consider that evidence, nor do we.

the disclosure of the Notebook No. 1 does not explicitly show a laser with "side members being transparent to the pumping energy and transparent to or absorptive of other energy radiated thereat" although he did indicate his belief that it was obvious that such was the construction of the side members of the apparatus of Figure 1 of the disclosure. * * * Although it is urged that one skilled in the art would realize that the walls of the tube illustrated on page 1 of Notebook No. 1 were non-reflective and, specifically, were transparent to both pumping and laser light we are not prepared to accept this unsubstantiated conclusion.

Set forth below are the drawing and associated text in Gould's notebook which he relies on to establish conception:

Some rough calculations on the feasibility of a LASER: Light Amplification by Stimulated Emission of Radiation conceive a tube terminated by optically flat

partially reflecting parallel mirrors. The mirrors might be silvered or multilayer interference reflectors. The latter are almost lossless and may have high reflectance depending on the number of layers. A practical achievement is 98% in the visible for a 7-layer reflector. * * *

Consider a plane standing wave in the tube. There is the effect of a closed cavity; since the wavelength is small the diffraction and hence the lateral loss is negligible.

If the tube contains an excess of atoms in a higher electronic state, a plane travelling wave may grow by inducing transitions in the atoms, which must add energy to the wave * * *.

* * * * * *

There are several possibilities for excitation:

A. Optical excitation from an external discharge. * * *

* * * * * *

*the narrow beam*

B. The (coherent) beam of light would emerge from the partially transmitting mirrors as a wave which was plane to within a fraction of wavelength, that is the beam would have an angular divergence $10^{-5}$ or better. At a distance of one kilometer the beam would have broadened $\sim 1$ centimeter. Thus the beam could travel long distances essentially unweakened. Application to communication, radar etc. are obvious. * * *

It is true, as the board noted, that Gould has conceded that his notebook disclosure does not state "in so many words" that the side walls of the contemplated device are "transparent to the pumping energy and transparent to or absorptive of other energy radiated thereat," as count 1 requires. However, Gould submits that "even a relatively untrained layman" should be able to understand that the disclosed apparatus meets the terms of the counts in those respects, and that the board erred in failing to consider expert testimony on that issue. In addition to his own testimony, Gould introduced expert testimony intended to establish that Exhibit 1 constitutes a sufficiently full and clear conception to enable one of ordinary skill to build an operative laser. Schawlow also introduced expert testimony to show that Exhibit 1 was insufficient in that respect. Inasmuch as the experts testified in 1963 regarding material written by Gould in 1957 we are unable to determine how much, if any, their views might be affected by knowledge of the requisite structure of a laser device acquired during the intervening years. At

any rate, in order to illustrate the con-flicting views of even the experts in this field, we quote at length from their tes-timony.[5]

5. For example, one of Gould's witnesses, Dr. Peter Bender of the National Bureau of Standards, testified that one of three essential elements of a laser, in addition to a working medium and means for pro-ducing a population inversion in the work-ing medium, is a structure "capable of giving some feed-back of radiation emitted by the atoms or molecules to obtain a high degree of coherence" and "which allowed substantial energy generation in only a few of the resonant modes of the structure * * *." He further stated:

Q41. What is one of the simplest examples of such a structure? A. The so called Fabry-Perot cavity.

Q42. What does a Fabry-Perot cav-ity consist of essentially? A. This consists of flat parallel mirrors.

\* \* \* \* \*

Q60. A third essential of a laser structure of the type which we are discussing, I believe you stated was the structure? A. Yes.

Q61. And I believe you gave an ex-ample of such a structure as being a Fabry-Perot cavity? A. Yes.

Q62. What type of structure is sug-gested in that notebook [Exhibit 1]? A. The notebook suggests just this type of structure.

\* \* \* \* \*

Q81. Are there any further signifi-cant elements enumerated there [in patent claim 4, count 1], besides the three that we have been talking about? A. It does refer to the side members being transparent. However, this ap-pears to me to be implicit in Gould's notebook number one.

Q82. Is it an implicit requirement of a laser, assuming that it is to be optical-ly pumped? A. It in general is necessary, in order to achieve a high degree of coherence. It is also of course necessary to permit the pumping radiation to enter the cavity.

\* \* \* \* \*

Q101. In what way can you obtain this condition of coherency to a con-siderable degree in some of the related phenomena that we have been dis-cussing in a laser? A. The use of a structure with the reflecting mirrors at the end, and with the longitude dimen-sion considerably longer than the trans-verse dimensions, accomplishes this purpose.

Another Gould witness, Dr. Peter Franken, professor of physics at the University of Michigan, appears to have been more equivocal than Dr. Bender:

Q38. Professor Franken, let me now direct you more specifically to Exhibit 1, and ask you if there is an optical cavity disclosed in that document? A. Yes. On page 1 is described an optical cavity usually referred to as one of the Fabry-Perot type.

Q39. Does this document use that terminology expressly? A. The words "Fabry-Perot" do not appear in Exhibit 1. I use the term myself because it is in common usage today to describe this particular type of cavity.

Q40. What are the features of this particular type cavity that you find that characterize it as a Fabry-Perot in your mind? A. It consists of optically flat, plane, parallel, partially reflecting mir-rors separated in this instance by a length significantly greater than the diameter of the mirrors. I am re-ferring specifically to the figure and the description of page 1.

\* \* \* \* \*

Q88. Referring to this Exhibit No. 1, Gordon Gould's notebook, and specifical-ly the notarized pages, do you find in there a sufficient disclosure for one ordinarily skilled in the art to follow and produce a laser, more specifically, a Fabry-Perot laser? A. Yes.

\* \* \* \* \*

Q113. Does it [the structure of Ex-hibit 1] have non-reflective side mem-bers? A. The construction of the side members isn't specified.

Q114. Does it have reflected side members? A. These are not indi-cated.

Q115. If you were to build a device, would you build it with reflective side members? A. What device do you have in mind?

Q116. The device that is suggested here. A. I would not.

Q117. Why would you not build it that way? A. Because this document does not instruct me to and, in addition, this document teaches me, further on, that I must project pumping radiation through the active medium.

Q118. What, then, would be the in-ferred teaching with respect to the re-flectivity of the side members? A. The presumption is that the side mem-bers serve only a structural function; that is, a means of maintaining the parallelness and separation of the plates and a means of containing the active medium.

I want to add that I am interpreting your question to mean how would I go

363 F.2d—58

Gould states in his brief with respect to the nature of the side walls of the disclosed device:

The count requires that the sides of the tube be transparent to the pumping energy. This is clearly taught by the Gould disclosure as it refers to *optical* excitation from an *external* discharge. If the medium within the tube is to be excited optically from an external discharge clearly some portion of the tube has to be transparent. Gould has already stated that the flat ends of the tube are 98% reflective so that it is impossible to fail to understand from the disclosure that the

about constructing the device described in this notebook.

Q119. Would one ordinarily skilled in the art in November, 1957 go about construction of the device in the same way according to the teaching of this document, in your opinion? A. I think so.

\* \* \* \* \*

Q124. Is a mechanism for pumping the laser medium indicated? \* \* \* A. We are clearly instructed to provide optical excitation from an external discharge. The geometry of that arrangement is not specified, nor is the exact nature of the sources.

\* \* . \* \* \*

Q130. Are the side members of the apparatus, let us say the apparatus on page 1 of the notebook of Gould, transparent to the pumping energy and transparent or absorptive of other energy? \* \* \* A. As I mentioned before, the structure of the side members is not specified in this notebook.

Q131. If the device were to be constructed by one of ordinary skill in the art in November, 1957, would it be constructed with side members transparent to the pumping energy and transparent to or absorptive of other energy. A. It would surely be constructed transparent to the pumping energy. Whether or not these walls would be constructed to have particular absorption bands, such as to eliminate undesirable radiations, would depend on the ingenuity of the person and is a matter of conjecture.

Q132. I believe that takes care of the pumping energy. With respect to other energy, would the side walls be either transparent or absorptive of other energy as well as the pumping energy? To clarify my question, I don't mean all other energy, obviously. A. Specific instructions for these aspects of the design are not included in this notebook.

Q133. I am referring back to my previous question. I am trying to get a full answer to my previous question, which was the manner in which this would be constructed by one ordinarily

skilled in the art following the teaching of the notebook in November, 1957, not the previous question with regard to specific instructions. A. The only definite statements that I can make are that the side walls would be transparent to the pumping radiation and would serve or satisfy some of the obvious structural requirements.

Q134. Can you say anything with respect to the laser radiation and the characteristics of the side walls with respect to it? A. Not from this notebook.

Although Dr. Franken, like Dr. Bender, likened the device disclosed by Exhibit 1 to what is now known as a Fabry-Perot device, it is never made clear how that conclusion is reached in view of the admitted absence of clear teaching with respect to the side walls. Nor is it clear what relation the side walls necessarily bear to a Fabry-Perot device, particularly in view of both parties' testimony that the Fabry-Perot cavity consists only of spaced flat parallel mirrors.

Schawlow's expert, Dr. C. G. B. Garrett of Bell Telephone Laboratories, testified:

Q46. Does Exhibit 1 discuss any method of pumping an active medium? A. There is only one sentence which might have some bearing on that. This is the sentence on page 5, "optical excitation from an external discharge." No specific disclosure is made at this point or elsewhere in Exhibit 1 as to how such excitation is to be achieved.

\* \* \* \* \*

Q54. Is there any indication in Exhibit 1 of what kind of external discharge would be used to provide the excitation? A. No.

\* \* \* \* \*

Q60. Is there any indication in Exhibit 1 of how the light from the external discharge is to be coupled to the active medium? A. No.

\* \* \* \* \*

Q94. In your opinion, could an ordinarily skilled physicist have followed the disclosure in Exhibit 1 and build an operable laser in 1957? A. No.

sides of the tube are transparent to the pumping energy, that is the "optical excitation from an external discharge."

\*    \*    \*    \*    \*    \*

Counts 1 and 2 also call for the sides to be transparent to or absorptive of "other energy. \* \* \* it is quite clear from Gould notebook No. 1 that the sides are *transparent* to this [laser] light. If the side walls were *reflective,* the tube would *actually* constitute a closed cavity. Gould clearly explains that the cavity is not closed in actuality. He states "there is the *effect* of a closed cavity; since the wavelength is small the diffraction and hence the lateral loss is negligible." [\*] Gould's statement also clearly indicates that if it were not for the fact that diffraction effects are small there would be nothing to prevent the loss of laser light through the sides of the tube. That is, they are transparent.

In answer to the argument marked by [\*], Schawlow urges:

However, it is to be noted that this statement is prefaced by the statement "Consider a plane standing wave" indicating that the subsequent discussion was concerned particularly with such a wave. The plane standing wave could be expected to be the dominant wave in a cavity having parallel reflective end members and is the one in which Gould was primarily interested. Such a wave corresponds to the wave bouncing back and forth between the two end members, without striking the side members. It is evident that for such a wave the parallel end members bound the field configuration and simulate a closed cavity. In other words, for the case postulated of only a plane standing wave, the nature of the side members is irrelevant; they can be reflective or non-reflective with little effect on the plane standing wave. This explains why Gould said nothing about the side members. For the case he analyzed in which only a plane standing wave was considered, the side members were, in

fact, unimportant. What was unappreciated by Gould (and also apparently initially by Townes, too) was that unless the side members were made transparent or absorptive (i. e. non-reflective) of the stimulated light, additional undesired oscillatory modes could also be simultaneously excited. This failure to appreciate that a large number of modes were likely to be excited simultaneously was understandable because it was not a problem in the microwave maser, the area of Gould's maser expertise. In other words, Gould did not then recognize that there was a problem and, accordingly, made no effort to provide a solution.

Gould, in turn, contends in his reply brief:

\* \* \* "Additional undesired oscillatory modes could also be simultaneously excited" [referring to Schawlow's statement above] means, in plain English, that rays of laser (stimulated) light could be emitted over a wide range of angles and thus the highly useful, narrow, almost non-diverging beam of the Fabry-Perot laser would not be produced. It is possible to understand this intuitively in terms of the fact that laser light rays could bounce off the side walls of the laser if they were reflective, and thus the lased output would not be restricted to rays which were almost precisely perpendicular to the parallel plane reflectors.

It is urged that Gould perfectly understood the necessity of non-reflective side walls to produce a non-divergent beam of light as evidenced by the last paragraph quoted from Exhibit 1.

As the last word in this already lengthy interchange of argument, Schawlow points out:

\* \* \* It is now known that when the side walls of a laser are made reflective of the stimulated light there is a tendency for the laser to oscillate in a plurality of modes of slightly different wavelengths and directions. \* \* \* Appellant's reply brief takes

the position that Gould necessarily understood this perfectly because he postulated that the device he described would provide a non-diverging beam. It is difficult to see how this postulate establishes that he in fact appreciated that non-reflective side members were essential to this desired result. Obviously if he failed to appreciate that reflective side walls resulted in additional modes and a diverging beam, he would believe that he would achieve a non-diverging beam independently of the nature of the side walls.

As reflected above, most of the testimony and the parties' arguments hereinbefore quoted are concerned with whether Gould conceived a laser device with side members "transparent to or absorptive of other energy radiated thereat," referring to stimulated laser light undesirably deviating from a path perpendicular to the reflective end members.

We think it is clear from the contentions of the parties and the expert testimony that the pages of Exhibit 1 are susceptible of numerous interpretations, each ostensibly plausible, as to what was actually in Gould's mind when he wrote those pages. In our opinion, Gould's notebook #1 is too ambiguous to justify the conclusion that he possessed "a definite and permanent idea of the complete and operative invention," or that he made his invention "sufficiently plain to enable those skilled in the art to understand it." See Townsend v. Smith, 36 F.2d 292, 17 CCPA 647.

As was stated in Mergenthaler v. Scudder, 11 App.D.C. 264:

* * * But if drawings be exhibited and relied on, as evidence of the conception of the invention, they must show *a complete conception, free from ambiguity* or doubt, and such as would enable the inventor or others skilled in the art to reduce the conception to practice without any further exercise of inventive skill. (Emphasis supplied)

We agree with the board that Gould has not proved by a preponderance of the evidence that his conception of the laser device described in Exhibit 1 included side members which are non-reflective, viz. transparent to or absorptive of other energy, particularly undesired stimulated laser light, radiated thereat.

But even assuming for purpose of discussion, as did the board, that Gould properly discharged his burden of proving conception of the invention, which we do not think is the case, he still must prove reasonable diligence in reducing that conception to practice in order to prevail. That question we now consider.

### Diligence

To establish reasonable diligence during the critical period from just prior to July 30, 1958, to April 6, 1959, Gould relies principally on his own testimony; that of his wife, Ruth; Exhibit 9, a notebook said to represent a "distillation" of his efforts from November 1957 to December 1958; and the testimony of his patent attorney relating to their joint activities from December 1958 to April 1959.

Little or no question has been raised by either the board or Schawlow concerning Gould's diligence from December 1958 to his filing date of April 6, 1959. The record shows that during that time Gould's attorney prepared the present application [6] while concurrently engaged in a 40-day patent infringement trial in Utica, New York. Under the

---

6. Schawlow points out that Gould's activity directed toward filing his patent application appears to have begun only after Gould saw, on or about December 1, 1958, a preprint of a paper published December 15, 1958, by Schawlow and Townes in the Physical Review. The preprint, substantially identical in text to the printed article, described in detail the particular laser invention here in issue. Schawlow contends that similar circumstances have been deemed to require more convincing proof of diligence than might otherwise have been the case, citing Andrew v. Downs, 8 F.2d 1014, 56 App.D.C. 398. Since we find Gould has not met his burden of proving reasonable diligence by a preponderance of the evidence, we think it unnecessary to rule on the issue presented by Schawlow.

circumstances, we do not think further discussion of the activities of Gould or his attorney during that period of time is necessary.

It appears from Gould's testimony that, shortly after recording his alleged conception in Exhibit 1, he became cognizant of the potential high cost of building his proposed device, and also became "aware of the considerable experimental difficulties in dealing with the alkali elements," the material he proposed as a working medium in that notebook. He began to consider "other possibilities that might be easier * * * to build," stating that "I was more interested in seeing it [the laser] built than trying to protect myself in my patent interests." He testified that he worked on such theoretical considerations evenings and weekends at home and in libraries, studying "a large amount of background material" and making "rough calculations in connection with that background material." As an example of some of the things he did during that period Gould stated he "conceived of a number of other pumping mechanisms besides optical pumping," and spent "maybe a hundred hours" searching the "M.I.T. wave length tables" for coincidences between strong spectral lines to find "elements that could be optically pumped." He also described the laser invention "briefly" to his patent attorney in January 1958, and was advised at that time that Columbia University would have no patent rights in that invention. The motivation for that visit to his attorney, Gould stated, was that he realized "more and more what an important development" the laser would be, having written the notebook constituting Exhibit 1 and having made a further study of the background material.

In the belief he would not be able to do experimental work on the laser at Columbia University until he had completed his thesis, Gould simultaneously sought to locate a research facility where experimental laser work could be done.

To that end he visited Stevens Institute of Technology sometime between November 1957 and February 1958, where Professor Bostick told Gould that there were insufficient funds available at Stevens to support work in the laser field. Gould stated he described the laser "in great detail" in March 1958 to his friend, Dr. Alan Berman, an individual "knowledgeable in the area of masers, generally," upon seeking employment to work on the laser at Hudson Laboratories, where Dr. Berman was associate director.

In late March 1958, Gould left Columbia University without completing his Ph.D. degree requirements, and joined the staff at TRG, Inc. According to Gould, his reason for leaving Columbia and joining TRG was to have an opportunity to do experimental work on the laser, having understood from his interviews with Dr. Daly of that company that he would have such an opportunity after completing his initial assignment on a research contract relating to a rubidium gas frequency standard, a project which occupied Gould's working time until the end of May 1958. While on that project, he disclosed his laser concept to co-worker Newstein. His next project was to write a proposal to build a rubidium maser which occupied his time until June 13; in the ensuing months through October, Gould apparently was engaged in experimental work on the rubidium maser.

During his free time from March to June 1958, Gould stated he "was busy formulating and writing down in a notebook the principles of the laser." The notebook referred to apparently is Exhibit 9, about which we will have more to say later. Gould testified he took 6½ days off from work at TRG in July, telling Dr. Goldmuntz, TRG's president, that he wished to finish writing his thesis.[7] Actually, Gould stated, the real purpose of taking time off was "to get this laser notebook written," since he believed he would never finish it in a

---

7. Goldmuntz testified that, during the summer of 1958, Gould did ask for time off "to work on his thesis and related matters."

reasonable time by working on it only on weekends and evenings. Gould testified he took off two days in August, three days in September, 13½ days in October and 12 days in November for the same purpose. In August, Gould again talked to Dr. Berman concerning the laser, explaining "how it worked and what its applications would be."

Toward the end of September 1958, Gould first informed Dr. Goldmuntz of his ideas concerning the laser, and was subsequently assigned to write, on company time, a proposal[8] describing the device and methods of building it. By the middle of December 1958, the proposal was completed and submitted to various government agencies and Aerojet General Corporation for evaluation. The Advanced Research Projects Agency subsequently awarded TRG a research contract totaling nearly a million dollars for development of the subject matter of the proposal.

█ Summarizing his activities over the period November 1957 to December 1958, Gould estimated he spent "approximately a thousand hours" acquiring the knowledge which enabled him to devise the ideas expressed in Exhibit 9, and that there were no months or weeks during that period in which he did not "work on the laser."

In commenting on Gould's evidence of diligence, the board stated:

* * * we do not find that a sufficient account has been made of the critical period so that we can assure ourselves that no unexplained lapse appears therein. Occurrences such as Gould's failure to participate in the reconditioning of his boat in the spring of 1958, and conversations such as those with co-worker Newstein at TRG, Inc. and with Dr. Alan Berman at beach parties in May and August,

1958 do not corroborate specific significant acts directly related to giving the invention a physical embodiment. Such evidence is far too fragmentary, and leaves to mere inference that Gould was actively engaged in reducing the invention to practice during this crucial period. We are not prepared to make this inference.

Nor are we. Even were we to disregard for the moment the necessity for corroboration and thus give Gould's testimony the full weight to which properly corroborated testimony in an interference is entitled, we find the testimony in and of itself insufficient to adequately establish *what* Gould did and *when* he did it. Little attempt has been made to identify particular activity with particular times during the critical period of concern—July to December 1958 and especially July, August and September 1958—or to establish how such activity related to reducing to practice the subject matter of the counts. In our view, Gould's testimony taken as a whole does not set forth adequate facts to support a finding of that continuity of activity which constitutes reasonable diligence. Merely stating that there were no weeks or months that he "did not work on the laser" is not enough, absent supporting facts showing specifically what that "work" consisted of and when it was performed.

█ Much of Gould's more detailed testimony, as summarized above, relates to the period November 1957 to March 1958. Apart from his general assertions that there were no weeks or months in 1958 that he did not work on the laser, we find the only relevant activities from July to September 1958 referred to by Gould are his acts of taking off from work at TRG in those months and his discussion with Dr. Berman in August.[9]

---

8. While that proposal is not part of the present record, testimony shows that it describes various laser devices, as well as many systems incorporating laser devices.

9. We agree with the board that Gould has not shown the relevance of the August conversation with Dr. Berman to reducing

the laser of the counts to practice or overcoming obstacles in the way of a reduction to practice. Something more than mere conversation or keeping an idea under consideration is required to constitute diligence. See Cottrell v. Shafer, 97 F.2d 121, 25 CCPA 1171.

Gould asserts the board erred in basing its decision as to the question of diligence in part on the extent to which Gould took days off from TRG to record his ideas in Exhibit 9. While reasonable diligence does not require that one abandon his means of livelihood to further his reduction to practice, it was incumbent upon Gould, if he intends to rely on the taking of time from his normal employment as acts of diligence, to establish *what* was done and *when* it was done. Merely stating, for example, that he took off 6½ days in July, 2 days in August, and 3 days in September does not enable us to ascertain the extent of time gaps in his activity. The months of July and August, bracketing Schawlow's entry into the field, are critical to Gould's case, and a lapse of nearly two months would result if 6½ days were taken at the start of that period and the 2 days at the end. The party chargeable with diligence must account for the entire period during which diligence is required. Gould has not done so here. As in Ireland v. Smith, 97 F.2d 95, 25 CCPA 1258:

> We may surmise that appellant was probably diligent * * * but mere surmise cannot take the place of proof * * *.

In any event, there is yet another requirement of the law of reasonable diligence, relating to the necessity of providing adequate corroboration of that diligence, which we feel Gould has not met. It is no reflection upon a party to an interference that a court refuses to accept his uncorroborated testimony. The long standing requirement for additional evidence tending to confirm and strengthen or to demonstrate the probability of truth of an inventor's testimony has arisen because his opponent in an interference proceeding is rarely in a position to present evidence contradicting the inventor's statements as to his acts of invention.

While recognizing the validity of the above principles, Gould contends the board erred in failing to consider the testimony of his wife, Ruth, as to his diligence throughout the critical period. It is Gould's position that his wife's testimony, considered with his own, provides "basic support" for the proposition that he was working continuously "throughout the year 1958" on refinements necessary to achieving a less complicated reduction to practice of the laser invention.

Although the board did not mention Mrs. Gould's testimony, we will examine her testimony in somewhat greater detail in view of Gould's emphasis thereon here. On direct examination, she stated that, *prior* to and apparently shortly after Gould's incorporation in November 1957 of his conception ideas in the notebook constituting Exhibit 1:

> He was supposed to be [working on his thesis], but he was not spending as much time on it as he should have. He was spending most of it working on the laser.

She further stated that at "that time" he worked "three or four times a week" at his desk, "calculating, reading the literature."

On cross examination, Schawlow's counsel elicited testimony that, although she possessed a Ph.D. degree in biophysics, she understood Gould's work on lasers, as well as his work at Columbia University, "only vaguely."

The following colloquy on redirect is, in our opinion, the only testimony of Mrs. Gould which can reasonably be said to bear any relation to Gould's activities after he left Columbia University in March 1958:

> RDQ83. And from the time that he left Columbia he was working on the laser, and not on the thesis, according to your understanding? A. Yes.
>
> * * * * * *
>
> RDQ85. And how long did this continue, this work at home? I refer you to the time when a contract proposal was made of which you were

advised.[10]  Did this work continue until that time? A. Definitely.

RDQ86. And beyond? A. I am not aware of any sharp time when it really stopped. It seems to me from the time he said he had conceived the idea he was continuously working on it.

In Kendall v. Searles, 173 F.2d 986, 36 CCPA 1045, this court said with respect to similar testimony:

> The testimony of appellant's other corroborating witnesses, namely, his wife and son, was of a general nature to the effect that appellant from the time of his conception worked continuously on the development of his idea. Their evidence, which was not specific as to dates and facts, does not constitute the kind of corroboratory evidence required to establish appellant's diligence during the critical period.

That statement is applicable here. In our view, Mrs. Gould's testimony fails to corroborate Gould's claim of diligence during the period July–December 1958, which is presumably the reason the board did not mention it.

Gould relies on one other piece of evidence—the bound notebook variously identified as Exhibit 9 and notebook No. 2—which he contends is "singularly impressive corroboration of diligence * * * from late 1957 through to December, 1958." In his brief, Gould describes Exhibit 9:

> * * * It comprises more than 87 pages of description and analysis and improved forms of the laser. The exact date when notebook No. 2 was commenced is not accurately known. The notebook is not a journal but is rather a summary and a record of extensive analyses from which only the successful results are recorded in the notebook itself. The notebook is not dated on every page. It is known,

however, that the first 23 pages were completed by August 28, 1958, by virtue of the signature and date placed therein by Lawrence A. Wills. The concluding page number 87 is dated December 1, 1958 (by Richard T. Daley and December 2, 1958, by Gordon Gould).

Schawlow points out that Wills and Daley, whose dated signatures appear on pages 23 and 87 of Exhibit 9, were not called as witnesses to establish the authenticity of the signatures or dates, and that no evidence has been introduced other than Gould's testimony that Exhibit 9 was even in existence on those dates. Schawlow also argues that Gould has not pointed out the relevance of much of the contents of Exhibit 9 to the subject matter in issue or what portions may be said to contribute to a reduction to practice.

■ Quite apart from those contentions, whether the counts be broadly or narrowly construed, the fact remains that Exhibit 9 is also wholly insufficient to establish the continuity of activity required for reasonable diligence. Gould concedes as much in his brief, and at oral argument counsel for Gould recognized that the notebook "probably could not attest to his continuous diligence." The notebook is not adequate corroboration of diligence if it establishes, in connection with other testimony, *what* Gould did but not *when* he did it. We simply cannot ascertain from the notebook and testimony during what portion of the period from November 1957 to December 1958 the bulk of the work summarized in Exhibit 9 was completed. While we do not depreciate the amount of time complex theoretical work of the sort represented in the notebook might require, the total period of time sought to be blanketed by the notebook is great—on the order of 13 months—and we, like the board, have no way of satisfying our-

---

10. The record does not identify just what "contract proposal" was contemplated by counsel or Mrs. Gould, or establish whether it bears any relation to the proposal submitted by TRG to government agencies in December 1958. It has been noted above that there is mention in the record of another proposal relating to a rubidium maser on which Gould states he worked in June 1958.

selves that unexplained lapses have not occurred.

Finally, Gould contends that the board has taken a "formalistic approach" to the doctrine of reasonable diligence in its statement:

> * * * we are not convinced that he was proceeding with due diligence in reducing the subject matter of the counts to practice during that portion of the critical period just prior to and after July 30, 1958, the record date of the senior party's entry into the field.

Whatever *due* diligence may be, Gould asserts, it would appear to reflect a particularly high standard, more than the "reasonable diligence" required by statute, and may not properly be required to establish priority.[11] The effect of the board's holding, Gould contends, is to deny him the benefit of the principle that

> * * * An inventor who is the first to conceive an invention can prevail, no matter how limited his resources may be, and no matter how long it should take him to complete the invention, if he devotes those resources at his command with reasonable and continuous diligence toward the actual reduction to practice of the invention.

Similar arguments have been made over the years, but the fact remains that the presence or absence of reasonable diligence must necessarily be determined by the evidence adduced in each case. Here the board held, and properly so, that Gould had failed to provide sufficient evidence to discharge his burden of proving reasonable diligence in reducing the invention to practice.

Gould would have us believe that his alleged efforts to construct a simpler and less expensive embodiment of his conception are penalized, rather than rewarded, by the patent statutes—statutes which have contributed mightily to the unprecedented advances of this country in so many fields. But such is not the case. Congress has wisely provided the same opportunity for the inventor whose attic is his laboratory as for the giants of modern industry to file a patent application and obtain the protection thereby afforded. We are aware of no valid reason why Gould could not have taken advantage of his opportunity to timely file his application and obtain the benefits of a constructive reduction to practice as did Schawlow. See Schweyer v. Thomas, 68 F.2d 953, 21 CCPA 859.

> Clearly it was the intent of Congress to assure the first inventor who had completed the mental act of invention that he should not be deprived of his reward by reason of delays which he could not reasonably avoid in giving his invention to the public. But we must bear in mind that it was not alone to reward the inventor that the patent monopoly was granted. The public was to get its reward and have the advantage of the inventor's discovery as early as was reasonably possible. * * *[12]

Our review of the record with due regard for Gould's arguments convinces us that the board did not err in awarding Schawlow and Townes priority of invention.

The decision is affirmed.

Affirmed.

MARTIN, Judge, concurring, with whom SMITH, J., joins.

In my view the proofs of Gould are satisfactory to show conception of side walls that are transparent to the pumping energy. Gould's Exhibit 1 refers to "Light Amplification" by stimulated emission of radiation and the excitation is optical from an external discharge. Thus, I agree with Gould that a side wall meeting that requirement of the counts was conceived.

---

11. It appears to us that the distinction between "due diligence" and "reasonable diligence" is at best a question of semantics. See Beidler v. Caps, 36 F.2d 122, 17 CCPA 703.

12. Hull v. Davenport, 90 F.2d 103, 24 CCPA 1194.

However, I do not think that conception of the requirement, "transparent to or absorptive of other energy radiated thereat," meaning non-reflective side walls so that other modes would not be excited, was established. Although some lateral loss was expected, that does not establish the concept of non-reflectivity of the side walls.

In my view, that is as far as this court need go and discussion of diligence is dictum, as clearly what has not been conceived as of a given date cannot be proven as constructively reduced to practice by showing diligence from that date. However, I find it necessary to add the following comments since I feel the board misconstrued the requirement of diligence when appellant urged that he was working toward an actual reduction to practice of a working laser, that is, a physical embodiment of the invention.

The board noted appellant has failed to prove "specific significant acts *directly related to* giving the invention a *physical embodiment*." [Emphasis added.] There is, however, but a single standard for diligence regardless of whether the parties rely on an actual reduction to practice or, as here in the case of *both* parties, a constructive reduction to practice. The board, in looking for specific significant acts *related* to a physical embodiment, seems to be setting a standard of diligence that cannot be met or is not required in any constructive reduction to practice case. This is particularly true where, as here, the nature of the invention is highly theoretical and actual reduction to practice is a financial impossibility for all but corporations or the government.

I do not think that any standard of diligence should penalize either the privilege afforded inventors of obtaining a constructive reduction to practice by filing a patent application or the inventor's attempts to continue toward an actual reduction to practice. To me the question is whether appellant has been diligent in working on *the invention,* whether toward preparation of papers for filing an application or toward construction of a physical embodiment. Leaving one's drawing board for the work bench should not be a presumptive "lapse" or break in the chain of diligence, even where at the work bench it becomes apparent that the physical embodiment is far off, and it is necessary to fall back on a constructive reduction to practice. This seems to be true particularly where the legal conclusion of whether the application satisfies 35 U.S.C. § 112 is not necessarily predictable. I would give little legal effect to an intervening contact with an attorney as the question is whether the inventor was diligent in working on the invention.

I do not mean to imply that I take issue with the majority's conclusion as to diligence and corroboration. Rather, I do not find it necessary to reach the issue. I simply do not wish to place any stamp of approval on the board's language.